1  BEN H. LOGAN (S.B. # 71711)
   O'MELVENY & MYERS LLP
2  400 South Hope Street
3  Los Angeles, California 90071
   Telephone:     (213) 430-6000
4  Facsimile:     (213) 430-6407

5  DANIEL M. PETROCELLI (S.B. # 97802)
   O'MELVENY & MYERS LLP
6  1999 Avenue of the Stars, 7th Floor
7  Los Angeles, California 90067
   Telephone:     (310) 246-6850
8  Facsimile:     (310) 246-6679

9  CHRISTOPHER CELENTINO (S.B. # 131688)
   DUANE MORRIS LLP
10 101 West Broadway, Suite 900
11 San Diego, California 92101-8285
   Telephone:     (619) 744-2246
12 Facsimile:     (619) 744-2201

13 Counsel for Lennar Corporation and Lennar Homes of
14 California, Inc.

15           **UNITED STATES BANKRUPTCY COURT**

16           **SOUTHERN DISTRICT OF CALIFORNIA**

17 | In re:                                              | Case No. 10-02939-PB11                                                                |
   |-----------------------------------------------------|---------------------------------------------------------------------------------------|
   | NICOLAS MARSCH III,                                 | RS No. OMM-4                                                                          |
   |                  Debtor.                            | Chapter 11                                                                            |
   |                                                     | **DECLARATION OF DANIEL M. PETROCELLI IN SUPPORT OF MOTION FOR RELIEF FROM THE AUTOMATIC STAY** |
   | Lennar Corporation and Lennar Homes of California, Inc., |                                                                                   |
   |                  Movants,                           | Hearing Date                                                                          |
   |        v.                                           | Date:       TBD                                                                       |
   | Nicolas Marsch III, Debtor and James L. Kennedy, Chapter 11 Trustee | Time:       TBD                                                       |
   |                                                     | Judge:      Peter W. Bowie                                                            |
   |                  Respondents.                       | Place:      Dept. 4, Room 328                                                         |
   |                                                     |             325 West "F" Street                                                       |
   |                                                     |             San Diego, CA 92101                                                       |

                                                              DECL. OF DANIEL M. PETROCELLI
                                                              IN SUPPORT OF MOTION FOR RELIEF
                                                              FROM STAY

**DECLARATION OF DANIEL M. PETROCELLI**

I, Daniel M. Petrocelli, hereby declare as follows:

1. I am a partner in the law firm of O'Melveny & Myers LLP, counsel for Lennar Corporation and Lennar Homes of California, Inc. ("Lennar Homes") (collectively, "Lennar") in these proceedings and other litigation involving Briarwood Capital, LLC ("Briarwood"), Nicolas Marsch III ("Marsch"), and other entities affiliated with Marsch. I am lead counsel for Lennar in all of the litigation described below. I submit this declaration in support of Lennar's Motion for Relief from the Automatic Stay (the "Motion").[1] I have personal knowledge of the following facts and, if called and sworn as a witness, could and would competently testify thereto.

**The DLA Litigation**

2. In 2008, Lennar brought two lawsuits against Brian Foster ("Foster"), DLA Piper LLP ("DLA"), and Marsch.

3. The first lawsuit was filed on January 28, 2008 by Lennar Homes and is entitled *Lennar Homes of California, Inc. v. DLA Piper US LLP, et al.*, San Diego Superior Court case no. 37-2008-00076811-CU-PN-CTL ("DLA-1"). In the DLA-1 litigation, Lennar Homes asserted claims against DLA, Foster, and Marsch for breach of fiduciary duty, malpractice, and aiding and abetting wrongful conduct that occurred in connection with Lennar's acquisition of a property known as McCrink Ranch. Neither Briarwood nor HCC Investors, LLC ("HCC") is a party to the DLA-1 litigation.

4. On September 30, 2008, Lennar Homes and other affiliated entities initiated a second action entitled *Lennar Homes of California, Inc., et al. v. DLA Piper US LLP, et al.*, San Diego Superior Court case no. 37-2008-00092842-CU-PN-CTL ("DLA-2"). This case asserts claims against DLA, Foster, and Marsch for breach of fiduciary duty, malpractice, and aiding and abetting wrongful conduct that occurred in connection with the acquisition of the Bridges project by HCC. The complaint in the DLA-2 litigation asserts claims both by Lennar directly and some

---

[1] Capitalized terms used in this declaration without definition have the meanings ascribed to them in the Motion.

1  claims asserted derivatively by HCC.  Most of the damages suffered were incurred by Lennar and
2  are asserted as direct claims by Lennar.  Other, less substantial, damages were suffered by HCC
3  and are asserted derivatively on behalf of HCC.

4        5.      Marsch filed a petition for Chapter 11 bankruptcy on February 25, 2010.  Before
5  Marsch filed for bankruptcy, the parties participated in substantial discovery.  For example,
6  Lennar served and DLA and Marsch responded to form and special interrogatories.  DLA served
7  and Lennar responded to form and 194 special interrogatories.  In response to requests, Lennar
8  also produced thousands of pages of documents.

9        6.      Much of the discovery exchanged, exhibits introduced, and trial testimony
10 provided in the Bridges Action is relevant to the DLA litigation.  Lennar is prepared to proceed
11 against Marsch with narrowly-tailored discovery to fill in information about a few remaining
12 blanks.

13       7.      On January 21, 2011, Marsch's latest personal attorney, Richard S. Van Dyke,
14 filed a substitution of counsel with the Superior Court indicating that he was now representing
15 Marsch in the DLA Cases.  Attached as Exhibit A is a true and correct copy of the January 21,
16 2011 Substitution of Counsel filed by Mr. Van Dyke in the DLA litigation.

17       8.      In the later part of 2010, Lennar, DLA and Foster engaged in mediation before
18 mediator Eric Green.  That mediation ultimately led to a settlement of the claims against DLA
19 and Foster, which is documented in a settlement agreement dated February 2, 2011 (the "DLA
20 Settlement Agreement").  The DLA Settlement Agreement contains strict confidentiality terms.
21 Lennar has no objection to sharing a copy of the DLA Settlement Agreement with the Briarwood
22 Trustee, the Marsch Trustee or Marsch and discussing it with them, if they are willing to sign a
23 confidentiality agreement consistent with the terms of the DLA Settlement Agreement.

24       9.      On February 7, 2011, Lennar notified the members of the HCC Executive
25 Committee (including Marsch), the Briarwood Trustee and the Marsch Trustee that Lennar and
26 HCC had settled with DLA and Foster.  Attached as Exhibit B is a true and correct copy of the
27 February 7, 2011 letter from Jon Jaffe to Marsch and Craig Bryant (the Briarwood Trustee's
28 representative on the HCC Executive Committee), with copies to the Briarwood Trustee, the

1  Marsch Trustee, and Marc Chasman. This letter indicated that Lennar would share a copy of the
2  DLA Settlement Agreement with them if they would execute a confidentiality agreement
3  consistent with the terms of that agreement. Marsch never responded.

4        10.    Counsel for the Briarwood Trustee advised me that the Briarwood Trustee would
5  prefer to seek production of the DLA Settlement Agreement through discovery against DLA. On
6  March 9, 2011, the Briarwood Trustee issued a subpoena to DLA seeking a copy of the DLA
7  Settlement Agreement. On March 18, 2011, DLA and Foster moved to quash that subpoena. My
8  understanding is that this matter is still the subject of litigation before this Court. Lennar has not
9  taken a position in this dispute.

10        11.    On February 16, 2011, Marsch filed a lawsuit in San Diego Superior Court (SDSC
11  Case No. 37-2011-51574-CU-CO-NC) against HCC Executive Committee members Jon Jaffe
12  and Marc Chasman, and HCC seeking declaratory and injunctive relief relating to certain
13  allegations concerning HCC. Promptly upon learning that Marsch had filed this litigation, Lennar
14  removed it to this Court, where it was assigned Adversarial Proceeding Case No. 11-90081-PB.

15        12.    On February 17, 2011, the day after Marsch filed this litigation, Mr. Van Dyke
16  sent me an email attaching a demand by Marsch, purportedly pursuant to California Corporations
17  § 17106(b), to inspect and copy all of HCC's records on February 28, 2011. Attached as <u>Exhibit</u>
18  <u>C</u> is a true and correct copy of Mr. Van Dyke's February 17, 2011 email and the letter attached
19  thereto.

20        13.    On February 18, 2011, my partner Ben Logan and I spoke to the Briarwood
21  Trustee's counsel, Jared Toffer of Finlayson Williams Toffer Roosevelt & Lilly LLP. Mr. Toffer
22  confirmed that the Briarwood Trustee had not authorized or approved Marsch's demands or the
23  filing of his lawsuit. He also indicated that the Briarwood Trustee had not sought to retain Mr.
24  Van Dyke or authorize Mr. Van Dyke to act on behalf of Briarwood or the Briarwood Trustee and
25  that the Briarwood Trustee did not condone Mr. Marsch's actions. Attached as <u>Exhibit D</u> is a true
26  and correct copy of the February 18, 2011 confirming email from Mr. Logan to Mr. Toffer (on
27  which I was copied).

28

14. After confirming that Marsch and Mr. Van Dyke's actions were not authorized by the Briarwood Trustee, I responded on February 18 to Mr. Van Dyke's February 17 email and letter, noting that the purported rights and claims being asserted "are exclusively within the province of the court-appointed trustees for Briarwood and Mr. Marsch" and that Marsch's demands and recently filed lawsuit had not been authorized by the Briarwood Trustee or this Court. Attached as Exhibit E is a true and correct copy of my February 18, 2011 letter.

15. Around the same time, Judge Lisa Foster scheduled a Case Management Conference in the DLA litigation for February 18, 2011 to discuss the settlement with DLA and Foster and proposals for dealing with the balance of the litigation. Counsel for DLA, Brian Foster and Lennar arranged for telephonic appearances. On February 15, 2011, Mr. Van Dyke advised me and the other counsel in this case that he would appear personally. Attached as Exhibit F is a true and correct copy of Van Dyke's February 15, 2011 e-mail so notifying counsel. Despite his representation, Mr. Van Dyke did not appear at the Case Management Conference held on February 18, 2011. Judge Foster scheduled the next Case Management Conference for August 5, 2011.

### The Florida Action

16. Since substantial information about the Florida Action is already in the record before this Court, I will only highlight a few recent developments regarding this litigation.

17. As this Court is aware, on August 26 and 27, 2010, the Florida Court conducted an evidentiary hearing on the sanctions motion that Lennar had filed against Mr. Minkow and FDI. I cross-examined Mr. Minkow at this hearing. At the end of the hearing on August 27, 2010, Judge Freeman indicated that sanctions were definitely in order and that "Minkow will lie, plain and simple."

18. On December 27, 2010, the Florida Court issued a 24-page written order concluding that Mr. Minkow and FDI were guilty of gross litigation abuse. The abuse was so egregious, the Court determined no sanction less than default against Mr. Minkow could put Lennar in the position it would have been but for the misconduct. The Court also ordered that an adverse instruction would be given to the jury at any subsequent trial against FDI.

19. Judge Freeman's December 27, 2010 sanctions order determined that Mr. Minkow is liable on the claims asserted by Lennar in the Florida Action. Lennar must still prove up its damages. Counsel for Mr. Minkow and I are discussing a protocol for proceeding with a damages phase, if any.

20. On March 24, 2011, the United States of America issued a Criminal Information against Mr. Minkow, accusing him of conspiracy to commit securities fraud, including by extorting Lennar.

21. On March 30, 2011, Mr. Minkow entered a guilty plea to the Criminal Information and executed a plea agreement. Mr. Minkow swore under oath that he, along with "Conspirator A and others conspired to execute a scheme and artifice to defraud Lennar Corporation . . . and to obtain, by means of false or fraudulent pretenses, representations, or promises, money or property from Lennar Corporation in connection with the purchase or sale of securities issued by Lennar Corporation. . . . In return for payment of a substantial fee, Minkow agreed to assist Conspirator A by, among other things, assisting with the execution of Conspirator A's threats to damage the reputation and character of Lennar Corporation and its individual officers. To induce Lennar Corporation to capitulate to Conspirator A's demands, Minkow created an internet website styled www.lennron.com. . . Through the internet website, press releases, e-mail communications, one or more youtube.com videos, and other methods of mass-publication, Minkow and others made false and misleading representations to the investing public about Lennar Corporation's financial condition and business structure. Further, Minkow and others made false and misleading statements about the personal character of Lennar Corporation's management . . . . Despite the fact that many of Minkow's allegations were unsubstantiated and vague, the scope of the allegations and Minkow's public stature created 'headline risk' that materially and fraudulently depressed the value of Lennar Corporation's common stock." Conspirator A has been identified to me, and based on indisputable evidence is, Marsch.

22. Mr. Minkow acknowledged that he and "Conspirator A" inflicted $583,573,600 in damage to Lennar.

23.     The plea agreement requires Mr. Minkow to cooperate with the government, including providing information, documents, and testimony against Marsch.

24.     Pursuant to his plea agreement, Minkow has provided to the government and to Lennar substantial documentation that reveals and corroborates the conspiracy between Marsch and Minkow to extort Lennar and manipulate the market of Lennar's publicly-traded securities. This evidence was plainly called for by Lennar's document requests served on both Marsch and Minkow. Marsch produced none of it.

25.     If the automatic stay is lifted, Lennar intends to seek terminating sanctions against Marsch (and Briarwood if the settlement with the Briarwood Trustee is not approved) for willful suppression of essential responsive evidence, among other discovery misconduct.

26.     Furthermore, Lennar is prepared to proceed against Marsch on the merits in the Florida Action with narrowly-tailored discovery to fill in information about a few remaining blanks.

**Prejudice to Lennar From Continuing Delay**

27.     If the automatic stay is not lifted to allow Lennar to proceed to litigate these cases against Marsch and the Marsch Estate, Lennar will be greatly prejudiced. The delay in prosecuting these cases against Marsch that has already occurred since Marsch and Briarwood filed bankruptcy has adversely affected Lennar. I have been a trial lawyer for 30 years. In my experience, if this litigation is delayed yet more, Lennar's rights will be prejudiced greatly. Witnesses' memories fade and they often move on to other matters. Documents are more difficult to retrieve. Lawyers who have become steeped in the law and facts also move on and, like witnesses, their memories fade.

28.     Marsch's demonstrated suppression of evidence makes this need to proceed promptly particularly compelling. Continued delay will provide him more time to suppress and destroy evidence.

29.     In sum, if the automatic stay remains in place so that Lennar is not able to proceed against Marsch, attempting to resurrect those cases against him later will likely cost Lennar

1  substantially in extra litigation costs and adversely affect Lennar's ability to succeed in that
2  litigation.

### Relationship to Non-Dischargeabilty Actions Against Marsch.

4  30.  On February 16, 2011, Mr. Van Dyke sent me an email in which he argued that the claims Lennar asserts against Marsch in the Florida Action and DLA Cases should be tried in conjunction with a Bankruptcy Code Section 523 non-dischargeability action that Lennar had brought much earlier and on which Marsch had defaulted. Mr. Van Dyke stated that he would be representing Marsch in that action asked Lennar "again" to set aside the default. Attached as Exhibit G is a true and correct copy of Mr. Van Dyke's February 16, 2011 e-mail.

10  31.  Mr. Van Dyke had never previously requested that Lennar set aside the default. Rather, in December 2010, one of Mr. Van Dyke's predecessors made this request, which Lennar had politely declined at that time and declined again. Attached hereto as Exhibit H is a true and correct copy of my February 16, 2011 email to Mr. Van Dyke.

14  32.  In my February 16, 2011 email, I also advised Mr. Van Dyke that his premise that these claims would be tried before the Bankruptcy Court in connection with a non-dischargeability action was inconsistent with this Court's prior ruling that it would abstain in favor of the Florida state court in trying the Florida Action against all defendants, including Marsch.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of May, 2011 at New York, New York.

/s/ *Daniel M. Petrocelli*
Daniel M. Petrocelli